Amphenol Corporation v. Factory Mutual Insurance Okay, Ms. Upshaw, just wait one second. Folks are clearing out. While we're at it, you're reserved for two minutes to respond. Okay, you may proceed. Thank you very much. May it please the Court. Margaret Upshaw for Appellant Amphenol Corporation. Under normal pleading standards, Amphenol's proposed amended complaint alleges physical loss or damage sufficient to state its claims for coverage. There is no per se bar against recovery for COVID-19 related losses. Instead, Connecticut Dermatology and this Court's cases applying Connecticut Dermatology require courts to closely analyze the allegations in the complaint and compare them against the test for physical loss or damage. Okay, so we've got Connecticut Dermatology. This is a state law case interpreting, we're using Connecticut law to interpret an insurance policy, right? Correct. And so in what ways is Connecticut Dermatology distinguishable from this case? Is it different policy language? Is it just the fact that you've characterized the shelf life of the virus longer than was the case in Connecticut Dermatology? So in Connecticut Dermatology, the plaintiffs there hadn't even alleged contamination or presence of the virus at their properties. The core theory at issue in Connecticut Dermatology was kind of the government closure orders that shut down facilities and caused their losses. That's not the theory we're pressing here on appeal. And I think the critical portion of the discussion that we're relying on in Connecticut Dermatology is that pages 202 to 203 of that decision where it talks about and it acknowledges cases involving substances, harmful substances that permeate or infiltrate a property and have been understood to state claims for physical loss or damage. And it distinguishes COVID-19 based on kind of its general understanding of how COVID-19 worked. In terms of the facts, it's the same COVID-19 as in that case, right? So you've put more of a spin on it here. Is there any difference in terms of the actual facts? So I think that the critical question is what do the allegations and the complaints say about how COVID-19 viral particles interact with the surfaces of the property? You're having more detailed allegations, but in terms of what actually happened, the virus descending upon the world, is there any difference in terms of the facts? So just to be clear on Connecticut Dermatology, I think that they actually ceased operating their businesses, whereas we were an essential business continuing to operate our business. So we have a good reason to allege that COVID-19 was being introduced onto the property and attached to the surfaces. But to be clear, what the truth of the facts were outside in the world is only relevant as reflected in the allegations and the complaint. And so in Connecticut Dermatology, the court didn't have any allegations about the persistence of the virus on surfaces. Here, we've specifically alleged- It's only a summary order, but we have the ITT case, which is indeed against Factory Mutual. Is that case distinguishable from this one? So I do think it is, and if I could just take a step back and talk about the two pieces of the analysis that we think exists within Connecticut Dermatology, and then explain why the allegations in ITT were missing an important component, I think that might be useful. So we understand Connecticut Dermatology to say, one, you need some physical, tangible alteration to the property, and two, that alteration essentially has to be meaningful in the sense that you had to take efforts to restore your property and restore the condition of property so that it would be fit and safe for normal use. And in ITT, the court was really clear. It looked at the allegations, and it said, you have no specific allegations of repair or restoration. Here, we have alleged repair and restoration and remediation of the property in detail, and I think that some of the key allegations include a seven-day shutdown of the facility for a full facility, deep cleaning with third-party contractors, using an electrostatic spray system. So this is the type of enhanced remediation that in other contexts courts have recognized does count as remediation of property damage. I think you're conflating the two things, though. I mean, Connecticut Dermatology says that the virus is not the type of physical contaminant that creates the risk of physical loss because it can be cleaned or left alone for a few days, and it no longer presents a threat. It seems to be the only difference between Connecticut Dermatology in this case is that now you're saying it takes 30 days for the virus to subside without cleaning. Am I missing something? So I think that's a critical distinction, and I think essentially that sentence that you just read sets out kind of the factual premises on which Connecticut Dermatology is operating. So you're saying that had it been alleged 30 days in Connecticut Dermatology, well, then the Connecticut Supreme Court would have gone in a different direction. Then it's like asbestos. So I think that, plus all of our other allegations about how it physically interacts with and attaches to the property, the specific allegation that simply wiping off the surfaces wasn't enough, and all of that substantiated by specific examples of the extensive efforts that we undertook to actually remediate our property and the fact that we shut down our business to do that do change the landscape. Even assuming you plausibly allege physical loss or damage, what about the contamination exclusion? Why isn't that right on point? I know the district court didn't reach it. I'm happy to go there, Your Honor. And I think that I'll say just at the outset I don't think the contamination exclusion can be read literally and that the court can focus only on the word virus, and that's for two reasons. First, a pure literal interpretation conflicts with the policy coverage itself. And second, that would conflict with R.T. Vanderbilt, which is the governing precedent on contamination and pollution exclusions in Connecticut. And I think the court has to grapple with that precedent in order to resolve the applicability of the contamination exclusion. When you say the governing precedent on contamination exclusions, that sounds a little bit like a one-size-fits-all. Don't courts look at the language of each particular exclusion to decide what it means? So if there's a precedent that adjudicates the meaning of a particular exclusion, but then we have a different one that uses words that weren't in that other one that are actually operative for the purpose of that case, how does that precedent really bind our analysis? So I think that this, to be clear, I think governing in the sense that the court should look at that precedent in interpreting this exclusion. There are certainly differences between our contamination exclusion and the exclusions that were at issue there. There are also striking similarities, and I think the mode of analysis of the exclusions is also critical. And on that, R.T. Vanderbilt makes very clear that you look at the exclusion as a whole. You cannot look at a single term in isolation. Instead, you interpret the terms within their context of the full exclusion. It says that expressly at 627. And then it says where you have an exclusion that's going to sweep so broad as to be meaningless, we're going to need a limiting principle in order to protect the reasonable expectations of the policyholder. And here we have a contamination exclusion that read literally would exclude coverage for any condition of property due to the presence of any foreign substance or impurity. So it sweeps extremely broadly. And I do think that R.T. Vanderbilt says that's concerning, and we need to think about what the logical limiting principle is. R.T. Vanderbilt supplies that. Factory Mutual hasn't dealt at all with the overbreadth. It offers no way to grapple with the extreme overbreadth of its exclusion. And so I think that's a serious concern. And I do want to touch on the conflict with the other policy coverage because I think that's important too. The policy expressly provides coverage for communicable disease response, but Factory Mutual says that essentially the contamination exclusion precludes all coverage for the presence of virus on the property. And I think that does not reconcile the two provisions of the policy, and that's yet another reason we think that you can't just zero in on virus and give the contamination exclusion the most simple interpretation. The contamination clause seems pretty clear on its face. Any condition of property due to the actual or suspected presence of any foreign substance, including virus, disease-causing or illness-causing agent, it seems to be squarely on point with the coronavirus. Why doesn't this control? So I think that if the court were to take that direct approach, it would mean that, you know, I don't think there's any ambiguity in any foreign substance either, but it would be far too broad. I mean, you agree that the language clearly covers the COVID-19? So yes, but I think that contamination within the- And we should ignore that clear language? So I think that's exactly what Archie Vanderbilt says to this court. Why should we ignore the clear language? I think that what Archie Vanderbilt says is under Connecticut law and kind of core principles of insurance, kind of insurance construction- There was coverage for communicable diseases and your client received a million dollars under those provisions. There's an exclusion here. The different pieces all seem to fit together or not. So I don't think so because I think that read literally that exclusion would sweep in everything, things like basic hazards like hail that you would expect to be covered because hail's a foreign substance. So I think that when you look at the exclusion on its face- We're looking at the COVID-19 and why wouldn't it apply to the COVID-19 situation? So in Archie Vanderbilt, the court was considering allegations about- You like that case, don't you? Your Honor, we really do think that that is the key guidance we have from Connecticut. So yes, we do. And I think that it is helpful. The court was looking at asbestos dust. It said that asbestos dust plainly falls under the plain language of the policy. And it said that expressly. And then it said that's not enough. We're not going to read the exclusion so broadly that it renders the clause meaningless. And we have the same problem here. And no limiting principle has been offered from Factory Mutual to cabin the scope of the exclusion. So I do think that that means that we need to narrow the scope. And then on the communicable disease- I think in R.T. Vanderbilt, the policy did not mention asbestos. And the case was about asbestos. Our case, the policy mentions virus and other terms that would seem to cover precisely coronavirus. So that is true. The policy didn't- Vanderbilt distinguishable? So I don't disagree with what you just described. But I don't think that it changes the mode of analysis. Because even so, the court wasn't struggling with whether asbestos dust fell within the listed substances. But it did say the listed substances are examples of contaminants or of pollutants. And we have the same thing here. We have a list of substances, and they're all cabined by this concept of contamination. And we think that under that principle, it makes sense to limit the exclusion to only traditional environmental contamination and pollution. All right. You're reserved two minutes for rebuttal. Thank you so much. We'll hear from Mr. Butch. Am I pronouncing your name correctly? Yes, you did. Thank you, Your Honor. May it please the court. Jonathan Butch, representing the Appalachia Factory Mutual Insurance Company, also known as FM Global. Your Honor, I'll quickly begin by touching on a couple of the questions that you asked my friend on the other side. The Connecticut dermatology case is the instruction handed down by the Connecticut Supreme Court on cases just like this, and it is not distinguishable. Well, I guess the only distinction is it's there. It's just a couple of days of shelf life. That's what I'm calling it. And here they're saying 30 days, and they're alleging studies support that. Yes. Is that a meaningful difference? It is not, Your Honor. In the companion case of Moda, handed down the same day by the Connecticut Supreme Court, that case states, quote, even proof of actual contamination would not be sufficient to establish that property was physically lost or damaged within the meaning of an insurance policy. That is right on point, and it addresses actual presence. The case that we submitted by letter last week, Your Honor, the Mashantucket Pequot case, addresses an allegation of virus that persists for, I think, 28 days.  That's almost exactly the same defendant that you got. Same policy. Same policy. Correct. Same exact wording with respect to these provisions, and the appellate court of Connecticut finds, well, affirms a dismissal of those allegations, so it's not distinguishable. It is, indeed, the same COVID-19 virus here, Your Honor, as it was in all of those cases, and literally in the thousand cases that exist. The virus does evolve, right, we've seen? In other words, it could be a different version of the virus. Could be. There's no such allegation, but all of the versions of the virus are the same in a critical regard, Your Honor, which is that, left alone, they will dissipate and become harmless over a period of time. And, indeed, Amphenol alleges that. So, while there may be some minor, well, I don't want to characterize them, there may be some mutations, every virus that's a COVID virus, which is what's at issue here, goes away on its own after a certain number of days. And that is what distinguishes this case and this type of claim from other contaminants, such as ammonia or gasoline, where that other contaminant becomes so integrated into the property that it's a different outcome. Well, we would, I mean, gasoline and ammonia, they would dissipate. If you emptied the building and left time, they would dissipate. You know, Your Honor, I respectfully disagree with that. Those courts found that those contaminants were so ingrained into the property that you had to physically make changes. Or what I really should say, Your Honor, gasoline and ammonia and other contaminants like that were found by courts to hit the standard of physical loss or damage under a policy in that those different contaminants caused, to use the Connecticut expression of it, distinct, demonstrable, I'm sorry, physical, tangible alteration of property. The COVID virus here has been found by the Connecticut Supreme Court not to cause physical, tangible alteration of property. So one of the things I'm trying to figure out in looking at that case is, do we view that as a global statement about the characteristics of COVID, or do we view it as a ruling based on the record presented in that case? And I'm not sure what the answer is because there's an objective truth out there that probably shouldn't be different from case to case. But one of the things I'm struggling with is that the early COVID cases and the Connecticut dermatologies, one of them, seemed to focus on business income loss from loss of use of the business. We had to get out of the building, we couldn't use it, and that caused us loss, and therefore our building was damaged. And there was language about, well, yeah, you're not saying the property, the physical plant was hurt and you had to fix it. Well, now here we have allegations that the physical plant was hurt and we had to fix it, and we didn't have the luxury of waiting for it to dissipate because we're an essential business. We had to keep operating. So there were costs to continually, it's not a loss of use case at all, it's the costs to continuing to make it usable as a physical plant because of the chemicals adhering to the property. Why is that different? Your Honor, I understand the question. Those costs that you are discussing are costs to make a facility safe for human occupancy and use. In fact, that is so stated, I believe, in the Connecticut Dermatology case itself where it talks about some reconfiguration and costs associated with that. With respect, again, to that, I would point to the Mashantucket Pequot case, and in particular where the Connecticut Appellate Court discusses a First Circuit case decided under Massachusetts law, but which I think is very instructive and persuasive, and it's the case of Lawrence General Hospital, which was a facility that had allegations that, I encourage the Court to look at them, but I would say they are not distinguishable from those made by Amphenol here, and they include allegations of reconfiguring the property and incurring costs in order to continue using the hospital during the COVID period. And that court, again, supplying Massachusetts law but not really distinguishable with respect to the requirement for alteration of property under Connecticut law, and they find that those allegations don't state a claim as a matter of law. But reconfiguring isn't, we need to reconfigure because there's virus particles attached to the surfaces, right? We need to reconfigure to keep people distanced. Correct. There's an allegation here that because we're continually using this, particles are making their way up into our HVAC system, and we're having to replace our filters, which are part of the property, on a much more frequent basis than we would in a non-COVID world, and we're having to do that not to keep people distanced from each other, but because particles are adhering to the filter. Why isn't that property damaged? And if it isn't, what's the risk downstream for things that I think we all agree are covered that suddenly cease to be covered? Yeah, Your Honor, the district court opinion here actually addresses that allegation in the proposed amended complaint from Amphenol, and it basically says that changing air filters is a maintenance activity, and furthermore, that there is no specific allegation or, yeah, allegation as to how it is that the virus damaged the filters or any other portion of the property, right? And so perhaps I am respectfully disagreeing somewhat, Your Honor, with the premise of the question. We have to get back to basics, which is, does the presence of this virus cause physical, tangible alteration to any property as a result of the presence of the virus? And absent that, there cannot be a claim for coverage under a first-party property insurance policy such as that at issue here. So reconfiguring spaces or changing air filters in order to ensure the health of humans is not an allegation that shows how any property, even those filters, was specifically tangibly altered by the presence of the virus as opposed to dust or anything else that an air filter is usually changed for as a maintenance activity. So is the move here that, at some level, notwithstanding the factual allegations by the plaintiff, based on the Connecticut Supreme Court's analysis, those allegations are implausible. They're off the table as a basis to move forward in these kinds of claims. Correct. And I would direct Your Honor to a quote already read in or noted by the court in Connecticut dermatology. The virus is not the type of physical contaminant, not the type of physical contaminant that creates the risk of a direct physical loss because once the surface is cleaned or simply left alone for a few days, it loses its physical threat. And again, in moda, as I recited, even with proof of the actual presence of the virus, that contamination, quote, would not be sufficient to establish that the property was physically lost or damaged within the meaning of an insurance policy. Those are definitive statements by the Supreme Court of Connecticut as to the inability of an allegation about the presence of this virus to cause, to even state a claim for causing insured physical loss or damage. And Your Honors, with one minute left, the contamination exclusion here, even if these allegations were sufficient to state a claim for physical loss or damage, i.e. the threshold to have a potentially covered loss, the contamination exclusion is right on point. Page one of Amphenol's reply brief alleges, asserts the, I think, saturation and presence of the virus itself throughout their property. As Your Honor asked my friend on the other side about the contamination exclusion, it excludes contamination, comma, and any costs due to contamination and continuing. Importantly, contamination itself is defined expressly as any condition of property due to the actual or suspected presence of a virus. In addition, the contamination definition includes the actual or suspected presence of a pathogen or a pathogenic organism and a disease-causing or illness-causing agent. R.T. Vanderbilt is not on point because the pollution exclusion in that case did not use the word asbestos or asbestosis, and the insurer there was trying to apply that exclusion to claims for asbestosis. Here we have an exclusion that plainly on its face says that we exclude the condition of property characterized by the presence of virus. In the R.T. Vanderbilt case, the court did say something about searching, you know, needing an outer boundary of an exclusion. Your Honors, here the outer boundary is the word virus. That's the word that is operative here. There's no need to look beyond that to find a boundary for application of this exclusion on its face. It plainly applies. And finally, Your Honors, there is no conflict with the communicable disease provisions of the policy. That has been found by many courts to be an additional coverage that addresses an unusual situation where there is the presence of disease at a location. The communicable disease coverage, again, is talking about humans who have a disease and there are other requirements. Whereas the contamination exclusion is expressly applicable to a condition of property, the very condition that Amphenol alleges here, Your Honor. All right. Thank you, Mr. Bush. You're welcome. We'll now hear from Ms. Upshaw for two minutes of rebuttal. Thank you very much. I just want to hit two things. First, the contamination exclusion and the way it conflicts with the communicable disease coverage, and then this question of whether there's some categorical per se bar to all of these claims. On the communicable disease coverage, you just heard Factory Mutual explain that they read the contamination exclusion to exclude all coverage for the presence of the virus. The communicable disease coverage, the policy specifically says that the additional coverages remain subject to the applicable exclusions in the rest of the policy. That's at A122. And then the communicable disease coverage provides coverage for the cleanup of communicable disease on property. So that contemplates the cleanup of virus. And Factory Mutual says the exclusion means that you can never get that coverage. That's an inherent conflict in the policy that requires a limiting principle on that exclusion. I would encourage the court to look closely at that. On the question of a categorical kind of rule, I don't think that you can read Connecticut Dermatology as holding that as a matter of fact, the COVID-19 virus interacts in a particular way with property or lasts for a certain number of days on property. Those are factual issues. We have factual allegations in our complaint as to how— But so did the intermediate appellate case that was cited in the 28J letters. How is this case distinguishable from that? Yes, and so I think, first of all, at a high level, I think Mashantucket confirms that there's no per se rule in Connecticut. The court there looked closely at the allegations in the plaintiff's complaint. It closely examined this area of the law. And then, yes, on the specific question, so it specifically says you need some tangible physical alteration to property. And then it says that the complaint lacked allegations as to how— the manner in which the viral particles, in fact, interacted with the property or altered the property. Our complaint includes specific allegations at A324-27 setting forth the way the viral particles attach to, absorb to, and become difficult to detach from property. Those are not present in the Mashantucket complaint. And I think that that was the critical piece that was missing there. Their allegations of remediation are also substantially different and far more conclusory. I would encourage the court to look at the underlying complaint. It's not the same as the allegations here. And I think that ultimately Mashantucket confirms that the analysis this court has to conduct is the one it would conduct in any other motion-to-dismiss case. Look at the allegations, look closely at the test and what's required, and compare them up. And we think that we have satisfied what's required, and the decision below should be reversed. Thank you. Thank you very much. We will reserve decision.